**COULTER & SMITH, LTD., a Nevada corporation, Plaintiff and Appellant,**

v.

**Roger RUSSELL, Roger Richards, and Kristen Russell, Defendants and Appellees.**

No. 950726–CA.

Court of Appeals of Utah.

Sept. 26, 1996.

Richard A. Rappaport and Leslie Van Frank, Salt Lake City, for Appellant.

Michael N. Zundel, John N. Brems, and Adam S. Affleck, Salt Lake City, for Appellees.

Before DAVIS, JACKSON, and WILKINS, JJ.

## OPINION

WILKINS, Judge:

Coulter & Smith, Ltd. (Coulter) challenges the trial court's summary judgment in favor of Roger Russell, Roger Richards, and Kristen Russell (Russell). We affirm.

## BACKGROUND

Coulter owned a parcel of undeveloped real estate in an unincorporated area of Salt Lake County. Russell controlled about 3.67 acres (Russell property) several hundred yards north of Coulter's property. Between Coulter's and Russell's properties were four parcels owned by four unrelated parties. Independent of each other, Coulter and Russell made plans to develop subdivisions on their respective properties.

Discovering their similar development plans, Coulter and Russell discussed joint development of their properties and the possibility of Coulter buying the Russell property. Coulter hoped to buy the intervening properties and develop all the properties together as a single subdivision. Based on their negotiations, Coulter prepared an option agreement on its letterhead memorializing Russell's offer to sell subdivision lots to be developed by Coulter on the Russell property. On April 27, 1991, Russell signed the following option agreement:

Dear Dr. Russell:

In response to your request for a written proposal to purchase your lots west of 1700

East at 10800 South, I submit the following offer which you may accept by signing below:

Price: $26,500 per lot during the 1st month following completion of the lots; price of each lot to increase $100 per lot each month thereafter until each lot is closed.

Upon completion of the subdivision development we offer to pay you $1,500 per lot; the balance of the purchase price ($25,000 at the outset) to be paid upon closing of each lot. We understand that the cost of the land and lot improvements will be paid upon closing of each lot.

The enclosed Work Exchange Agreement will initiate our cooperative efforts. We will proceed posthaste to annex and develop our tracts jointly. I believe that working in concert will greatly facilitate zoning and all other development concerns.

Respectfully,

/s/Nathan Coulter

Nathan Coulter

pmp

*Coulter & Smith Ltd. is hereby granted an option to purchase lots as per terms detailed above: This option terminates 2 years from the date of completion of the subdivision.*

| /s/Roger Russell | 4–27–91 1991 |
|---|---|
| Dr. Roger Russell | Date |

The last sentence was inserted above Russell's signature line and was handwritten, in contrast to the rest of the document which was typed. In his affidavit, Russell asserts it was not on the document he signed. Meanwhile, Nathan Coulter states in his affidavit: "At Russell's request before the ·Option Agreement was signed, and for his benefit, I added the handwritten language at the bottom of the Option Agreement indicating that the option was to terminate 2 years from the date of completion of the subdivision."

Another version of the document apparently shows similar handwritten language, but states the option terminates in twenty years, instead of two. Both parties deny the twenty-year language .was ever part of their agreement.

At the time Russell signed the option agreement, no lots existed on the Russell property. Further, the parties did not know how many lots could eventually be developed on the property because they had not yet attempted to annex the property to Sandy City and obtain zoning.

Although the parties believed the development could be finished by the spring of 1992, by that time Coulter had not substantially progressed toward completion—e.g., Coulter had not yet submitted a formal annexation petition, bought the four intervening parcels, or worked on the Russell property itself. Even so, Coulter had been laying groundwork for the development by negotiating to buy the four intervening parcels, hiring an engineering firm to design a subdivision including the Russell property, and enlarging a master drain system on the Coulter property to accommodate development on the Russell property. However, having failed to meet the parties' time expectations, Coulter began regularly reporting to Russell regarding Coulter's efforts to overcome several obstacles to the development.

In November 1992, Coulter was still attempting to facilitate the development of the properties, but had yet to achieve such crucial objectives as obtaining two of the four intervening properties and filing an annexation petition. At that time, Russell told Coulter he intended to sell the Russell property to a third party. "Problems and disputes" arising from Russell's proposed sale prompted Coulter and Russell to engage in three-way negotiations with the third party. They reached a preliminary agreement that eventually fell through. Coulter maintains that it then attempted to continue to pursue its development plans with Russell, but that Russell refused to return phone calls, to discuss the development, and to cooperate, and that Russell "completely frustrat[ed] Coulter & Smith's ability to proceed with the development."

In May and June of 1994, a competing developer offered to buy the Russell property and filed an annexation petition with Sandy City. The city annexed the property on September 13, 1994. The next day, Coulter filed suit against Russell, requesting spe-

cific performance of their option agreement. The trial court granted summary judgment for Russell.

Coulter asserts the trial court erred on four grounds as a matter of law in ruling: (1) Coulter furnished no consideration for the option agreement; (2) the option agreement violates the rule against perpetuities; (3) a reasonable time for exercise of the option had passed; and (4) the option agreement is unenforceable under the Statute of Frauds.

## ANALYSIS

■ In reviewing this summary judgment, we consider the evidence in a light most favorable to Coulter, the losing party. *See Machan Hampshire Properties, Inc. v. Western Real Estate & Dev. Co.*, 779 P.2d 230, 231 (Utah App.1989). We will affirm only if no material fact is legitimately disputed and Russell is due judgment as a matter of law. *See id.* We accord no deference to the trial court's legal determinations, but review them for correctness. *Id.*

### I. Consideration

■ We first address Coulter's argument that it did provide consideration to support the option agreement. The trial court found that "Coulter & Smith paid no money and furnished no consideration for the purported option at the outset of the option." While we find no evidence that Coulter paid money for the option, we disagree with the conclusion that it furnished no consideration.

■ An option agreement consists of two elements: "(1) an offer to sell, which does not become a contract until accepted; and (2) a contract to leave the offer open for a specified time." *Property Assistance Corp. v. Roberts*, 768 P.2d 976, 978 (Utah App. 1989). The second element—the contract to leave the offer open for a specified time— must be supported by its own consideration, apart from the consideration that may support the potential future contract for the actual sale. *See Jensen v. Anderson*, 24 Utah 2d 191, 192, 468 P.2d 366, 367 (1970) (citing *Walker v. Bamberger*, 17 Utah 239, 246, 54 P. 108, 109 (1898)); *Estate of Schmidt v. Downs*, 775 P.2d 427, 431 (Utah App.1989)

(citing *Spokane School Dist. No. 81 v. Parzybok*, 96 Wash.2d 95, 633 P.2d 1324, 1325 (1981)); *see also Ide v. Leiser*, 10 Mont. 5, 24 P. 695, 696 (1890) ("[T]here must be some consideration upon which the finger may be placed, and of which it may be said, 'This was given by the proposed vendee to the proposed vendor of the lands as the price for the option, or privilege to purchase.'" (citation omitted)).

■ "Consideration sufficient to support the garden variety contract will likewise support an option." 3 Eric M. Holmes, *Corbin on Contracts* § 11.7, at 508 (Joseph M. Perillo ed., 1996). It is well settled that consideration may be something other than money. Any "act or promise, bargained for and given in exchange for a promise" constitutes consideration. *Resource Management Co. v. Weston Ranch*, 706 P.2d 1028, 1036 (Utah 1985); *accord* Restatement (Second) of Contracts § 71 (1981); *see also* 2 Joseph M. Perillo & Helen H. Bender, *Corbin on Contracts* § 5.8, at 34 (1995) (stating consideration may involve "'some right, interest, profit, or benefit, accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other'" (citation omitted)); 77 Am.Jur.2d *Vendor & Purchaser* § 35 (1975) (noting under general contract principles, consideration for option may be promise "to incur some trouble or expense, or to do or not to do some lawful act").

■ In determining whether consideration existed to support the second element of the option agreement—the contract requiring Russell to leave the offer to sell lots open for a time—we look to the written agreement, which is clear and unambiguous as to the consideration issue. We interpret clear and unambiguous contract terms "according to their plain and ordinary meaning without resorting to extrinsic evidence." *Homer v. Smith*, 866 P.2d 622, 629 (Utah App. 1993), *cert. denied*, 878 P.2d 1154 (Utah 1994); *see also Anesthesiologists Assocs. v. St. Benedict's Hosp.*, 852 P.2d 1030, 1035 (Utah App.1993) ("[T]o interpret a contract, we first look to the four corners of the document to determine the intent of the parties."), *vacated on other grounds*, 884 P.2d

**1262**

1236 (Utah 1994). Further, "[w]e accord a trial court's interpretation of an unambiguous contract no deference, but review it for correctness." *Homer,* 866 P.2d at 629.

Contrary to the trial court's incorrect interpretation, we find the contract/letter at issue to contain the consideration provided by Coulter in return for the option to buy lots. In the letter, Coulter promised to "proceed posthaste to annex and develop our tracts jointly." His promise to do something he was not otherwise required to do supplied the consideration necessary to support the contract to leave the offer open. *See Resource Management Co.,* 706 P.2d at 1036. Accordingly, we reverse the trial court's determination regarding consideration.

## II. Rule Against Perpetuities

■ We next consider Coulter's contentions that the trial court should not have applied the rule against perpetuities to invalidate the option agreement and should not have determined on summary judgment that a reasonable time had already passed for exercise of the option. These issues stem from the fact that the option agreement does not explicitly provide a deadline for Coulter to fulfill its promise to jointly develop the properties and thus does not provide a deadline by which Coulter must exercise its option following development.

■ An option to buy land is an interest in real estate, *Coombs v. Ouzounian,* 24 Utah 2d 39, 41, 465 P.2d 356, 358 (1970); *Knight v. Chamberlain,* 6 Utah 2d 394, 397, 315 P.2d 273, 275 (1957), which is invalidated by the rule against perpetuities " 'unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.' " *Clark v. Shelton,* 584 P.2d 875, 876 (Utah 1978) (quoting John C. Gray, *The Rule Against Perpetuities* § 201 (4th ed. 1942)); *see also Anderson v. Anderson,* 15 Utah 2d 7, 9, 386 P.2d 406, 407 (1963). Moreover, "[i]t is not necessary that the interest vest in possession but merely that 'the persons to take it are ascertained and there is no condition precedent attached to the remainder other than the termination of the prior estates.' " *Anderson,* 386 P.2d at 407 (quoting J. Morris & W. Leach, *The Rule*

*Against Perpetuities* 1 (2d ed. 1962)). Three narrow exceptions to the rule have been created by statute: Utah Code Ann. § 9–8–505 (1996) (relating to preservation easements pertaining to historically significant real property); §§ 22–6–1 & –2 (1991) (exempting retirement trusts from rule); and § .57–8–28 (1994) (exempting Condominium Ownership Act from rule).

■ There is a well recognized contract rule that " '[w]hen a provision in a contract requires an act to be performed without specifying the time, the law implies that it is to be done within a reasonable time under the circumstances.' " *Cooper v. Deseret Fed. Sav. & Loan Ass'n,* 757 P.2d 483, 485 (Utah App.1988) (quoting *Bradford v. Alvey & Sons,* 621 P.2d 1240, 1242 (Utah 1980)). This rule has been applied by Utah courts in cases involving interests in land, and even in cases which also consider the application of the rule against perpetuities. *See Fredericksen v. Knight Land Corp.,* 667 P.2d 34, 38 (Utah 1983) (land option); *Catmull v. Johnson,* 541 P.2d 793, 795 (Utah 1975) (royalties option); *Cummings v. Nielson,* 42 Utah 157, 168, 129 P. 619, 622 (1912) (land option). However, in none of these cases, nor in any other case of record, has this general rule of contract construction been applied to defeat the operation of the rule against perpetuities.

In *Fisher v. Bailey,* 14 Utah 2d 424, 385 P.2d 985 (1963), the supreme court concluded that the rule against perpetuities was not violated where an option to purchase lots was required to be exercised within a period of five years. *Id.* at 988. In *Fisher,* the option provided for the purchase of sixty-one lots, of which fifty-nine were clearly described and two were to be determined during the course of the development. The first twelve lots were to be developed and transferred within ninety days. The remaining forty-seven were to be provided as completed, although a completion schedule was not expressed in the agreement. *Id.* at 986–87. Standing alone, this arrangement would be very similar to the present case, and would appear to violate the rule against perpetuities. However, in *Fisher,* the option also provided for an additional twenty-one lots after completion and transfer of the first sixty-one. *Id.* at 987.

These final twenty-one lots were to be transferred not later than a specified date five years from the date of the contract. *Id.*

Considering the question of the proper application of the rule against perpetuities in *Fisher,* the supreme court concluded that the document revealed the clear intention of the parties, as expressed in the words of the agreement, to complete the entire transaction regarding the first sixty-one lots prior to the transfer of any of the additional twenty-one lots. *Id.* at 987–88. Since the additional twenty-one lots were required to be transferred within five years, if at all, the court concluded the rule against perpetuities was not violated. *Id.* at 988. This conclusion was based upon an interpretation of the contract terms as expressed, and not upon an implied "reasonable time" to complete the contemplated transactions. "Although the contract does not expressly state that all of the lots must be transferred on or before July 1, 1964, it does definitely so indicate [by reference to the overall terms of the agreement]." *Id.* at 987.

In the present case, the language of the option agreement, even considered with the handwritten language alleged by Coulter to have been part of the agreement, does not expressly require the transfer of the interests in land to be completed, if at all, within the period of lives in being plus twenty-one years, as required by the rule. Admittedly, the agreement between Coulter and Russell requires Coulter to *begin* the development process "posthaste" and "immediately," but it expresses no completion date. The process of development is expressly made a precondition to transfer. Arguably, this process could take a longer period of time than allowed by the rule, despite the best efforts of all concerned. Regulatory, economic, geologic, or other concerns could interfere with the expeditious completion of the development.

The rule against perpetuities mandates that for an option agreement to be enforceable, the interests in land contemplated "must vest, if at all" within the period of the rule. Such is not the case here, although it is certainly possible that such vesting could occur. With or without the addition of the handwritten provision by which the option expires two years after the completion of the development, the rule is not satisfied and the agreement is void.[1]

Because the rule against perpetuities is dispositive, we need not and do not reach the other issues raised on appeal.

The judgment of the trial court is affirmed.

DAVIS, Associate P.J., concurs.

JACKSON, Judge (dissenting):

I respectfully dissent. The majority opinion regarding the rule against perpetuities is contrary to Utah law, the policies underlying the rule, and the great weight of authority in this country.[1] I would hold that based on the language of the option agreement and the circumstances surrounding this transaction the law implies a reasonable time within which Coulter may exercise the option. Thus, the option agreement should not be deemed void from its inception as the majority has decided; instead, we should remand to the trial court for the factual determination of a reasonable time. Then, only *if* the reasonable time exceeds the perpetuities period would this contract be void under the rule against perpetuities.

## I. UTAH LAW

Although my colleagues appear to attempt to make a definitive statement of the rule against perpetuities in Utah law, they misread *Fisher v. Bailey,* 14 Utah 2d 424, 385

---

1. Judge Jackson, in his eloquent dissent, offers an excellent argument for modification or revocation of the rule against perpetuities. While the result reached here may be disfavored by the courts of other jurisdictions, or for that matter, courts of Utah, it is for our supreme court, or the legislature of this state, to modify the law, not us.

1. Because the majority's rule against perpetuities analysis completely disposes of this case, its treatment of the consideration issue is superfluous. However, under my analysis which would reverse and remand, I would reach the consideration issue and would decide it exactly as the majority has.

Also, I would reach the statute of frauds issue raised by the parties and would reverse the trial court's ruling on that as well.

P.2d 985 (1963), a case essentially on point with the case at bar, decline to apply Utah's rules of contract construction as they should, and disregard the fact that no recorded Utah case has ever invalidated a transaction based on the rule.[2]

### A. Fisher v. Bailey

The majority opinion cites *Fisher v. Bailey*, 14 Utah 2d 424, 385 P.2d 985 (1963), for the proposition that—in rule against perpetuities cases—a reasonable time is not implied in contracts missing an express time-of-performance term. Rather, the majority contends, where a time for performance is missing—in rule against perpetuities cases—we must rely on "an interpretation of the contract terms as expressed" to determine the time of performance. This reading of *Fisher* is flawed.

*Fisher's* analysis of the missing time-of-performance issue was completely based on inference—drawn both from the language of the option contract *and* from the circumstances of the transaction—not on a cut-and-dried reading of the contract, as the majority tends to characterize it. At the beginning of the court's analysis in *Fisher*, it noted, "The whole tenor of this contract is for the immediate development, platting and transfer of these lots. . . ." *Id.* at 987. The court then supported its inference regarding the transaction's general mood by looking at the parties' intent as gleaned from such extrinsic evidence as the parties' statements in depositions and the actual history of the transaction, in addition to the overall language of the option contract. *Id.* at 987–88.

Not only did the *Fisher* court conduct what is essentially a reasonable time inquiry, but it concluded with language sounding suspiciously like reasonable-time-analysis language,[3] stating: "*[U]nder these circumstances* it would be *unreasonable* to hold that the option to purchase any of these lots could be exercised any substantial period of time after January 1, 1964, and therefore this contract does not violate the rule against perpetuities."[4] *Id.* at 988 (emphasis added)

---

**2.** The majority's statement of the rule against perpetuities in Utah law consists of a cursory recitation of the rule, together with a list of three statutory exceptions. *See* Majority opinion, at 1262. That statement is inadequate for two reasons. First, a more detailed analysis of Utah case law and the rule's policies is necessary to better understand how the rule should be applied in this case. Second, the language of the statutory exceptions simply outlines those narrow exceptions; it does not address the rule's substance, nor does it show any legislative intent to exclude the rule as a whole from judicial consideration. Indeed, the rule itself is found in case law only. The majority opinion appears to fall into the trap identified by Professor Leach:

> [I]t is too often forgotten that these twenty-seven words [of the rule as stated by Professor Gray] are simply an attempt by courts and text-writers to formulate in brief compass the results of a body of case law enunciating a policy against having property tied up by remote future interests. These twenty-seven words have no legislative force. . . .

W. Barton Leach, *Perpetuities: New Absurdity, Judicial and Statutory Correctives*, 73 Harv.L.Rev. 1318, 1320 (1960).

**3.** In their briefs, both parties here mistakenly portray Justice Crockett's concurrence in *Fisher* as conflicting with *Fisher's* majority opinion on whether the court should determine an implied reasonable time for the option's exercise. What Justice Crockett really did was simply clarify and explicitly label the majority's analysis. *Fisher v.*

*Bailey*, 14 Utah 2d 424, 385 P.2d 985, 988–89 (1963) (Crockett, J., concurring). He specified when a definite time for performance is not recited in a contract "the law will imply that it is to be done within some such reasonable time as it must sensibly be supposed was contemplated by the parties." *Id.* 385 P.2d at 989.

**4.** Of great interest, the court supported this statement with a citation to Annotation, *Option to Purchase as Violation of Rule Against Perpetuities or Rule Forbidding Restraints on Alienation*, 162 A.L.R. 581, 590 (1946), which states:

> Although no time for the exercise of the option to purchase is specifically designated in the contract, a court of equity will, if the instrument is reasonably susceptible of such construction, in order to avoid a construction which would render the contract void under the rule against perpetuities, determine the time within which, by a reasonable construction of the contract, the option must be exercised. *Where no time is fixed for the exercise of the option, it has been suggested that, in order to avoid the objection based on the rule against perpetuities, the option must be exercised within a reasonable time.*

(Emphasis added) (footnotes omitted).
Further, the *Fisher* court noted, "We have found no case where an option to purchase has been held to be void for violation of the rule against perpetuities under a contract similar to this one." *Fisher*, 385 P.2d at 988. The court observed that the only cases holding an option

(footnote omitted). The difference between *Fisher* and this case. is that the language of the option agreement here does not lead to the identification of an exact date by which the option may be exercised. That difference is unimportant, however. While the *Fisher* court may have been able to designate a date actually found in the contract—albeit related to another part of the contract—it supported its determination with evidence of party intent from sources both inside and outside the contract.[5] *Id.* at 987–88.

Likewise, I would read the option agreement here to contain an implied reasonable time for the option's exercise. Just as in *Fisher*, we have a missing time-of-exercise term, yet we also have evidence of the parties' intent regarding that term. The language of the option agreement states, "We will proceed *posthaste* to annex and develop our tracts jointly." (Emphasis added.) Further, the Work Exchange Agreement incorporated by the option agreement states development "work [is] to commence *immediately*." (Emphasis added.) The parties'

statements in their affidavits show the parties hoped the subdivision would be completed about a year from the date of the option agreement. The *Fisher* court used similar evidence from which to determine the implied reasonable time in that option contract. *Fisher*, 385 P.2d at 987–88. However, in this case, there is a factual dispute regarding what is a reasonable time for exercise of the option; thus, I would remand to the trial court for resolution of this issue.

## B. Rules of Contract Construction

The majority opinion concedes the rule of construction regarding the implication of a reasonable time in contracts missing a time-of-performance term is regularly applied by Utah courts, including in those cases involving option agreements. The majority opinion goes on to asset: "However, in none of these cases, nor in any other of record, has this general rule of contract construction been applied to defeat the operation of the rule against perpetuities."[6] Majority opinion, at 6.

void generally involve "the option to purchase in case the owner elects to sell such property 'at any time in the future,' thus clearly contemplating the possibility of a long period of delay before the option could be exercised." *Id.* (citing as an example *Henderson v. Bell*, 103 Kan. 422, 173 P. 1124, 1125 (1918)). The present case does not involve the kind of violative language identified in *Fisher*, nor does it seem to involve violative party intent.

5. The majority opinion states no reason why, solely in rule against perpetuities cases, we must look for party intent only within the four corners of a document. Perhaps they incorporate the parol evidence rule into the rule against perpetuities. In any event, no policy is served here by relying exclusively on contract language to show party intent. *See infra* pp. 1268–1269.

However, even assuming the *Fisher* court examined only the express language of the contract to determine a time of performance in that particular case, the entire analysis of the issue was based on implications of party intent. *See Fisher*, 385 P.2d at 987–88. And, nothing in *Fisher* or Utah law forbids us from looking outside the express terms of the contract for party intent. In fact, both *Fisher* and Utah law encourage it. *See id.* at 987 (discussing parties' statements in affidavits and actual history of transaction to show party intent); *see also infra* p. 1266.

Further, under the majority's reading, *Fisher* is not directly on point with the case at bar, which thus involves an issue of first impression of

whether we may look outside a document to discern party intent regarding an implied reasonable time in a case in which parties have raised the rule against perpetuities. Even were I to agree that *Fisher* does not control, I would subscribe to this principle: "In each case not controlled by all-fours precedent the issue should be whether the transaction violates the policy of the Rule," Leach, *supra* note 2, at 1320. I would recognize that

> [t]he Rule was created by judges and judges have shaped it. Our legislature has never acted on perpetuities [save to create three exceptions]. It has been left to the judicial branch to mold the law of perpetuities.... Thus we are free to apply it literally or modify it as common sense and justice dictate.

*Otter Creek Dev. Co. v. Friesenhahn*, 295 Ark. 318, 748 S.W.2d 344, 346 (1988) (Hays, J., dissenting).

6. The California Supreme Court addressed a similar argument as follows:

> The contention seems [to be] that although courts may construe agreements to avoid an invalidation for uncertainty they may not similarly construe agreements to avoid violation of the rule against perpetuities. Although the courts, at times, have been relentless in their application of the rule against perpetuities, they have seldom carried relentlessness to such extremes. Both the California cases, and those of a majority of other states, hold that a docu-

On the other side of the coin, neither has the rule against perpetuities ever been applied in a recorded Utah case to "defeat" general rules of contract construction. And, the majority opinion gives us no reason—policy, precedent or otherwise—why a contract should not be construed before the rule against perpetuities is applied.[7] It simply seems to hold a groundless deep reverence for the rule, applying the rule merely for the sake of it. However, "[t]he Rule Against Perpetuities is not sacrosanct.... It ought not to be treated as if it were." Robert J. Lynn, *Perpetuities Reform: An Analysis of Developments in England and the United States,* 113 U.Pa.L.Rev. 508, 528 (1965). The rule should be applied with an eye to its policy underpinnings, which I discuss below.

More importantly, I disagree with the way the majority frames the issue. There is no question the orthodox rule against perpetuities is the law in Utah. I view the implication of a reasonable time in this contract not as "defeating" the rule, but as a necessary step before applying the rule.[8]

Professor Gray—perhaps the best recognized authority in this area—stated, " 'Every provision in a [contract] is to be construed as if the Rule did not exist, and then to the provision so construed the Rule is to be remorselessly applied.' " W. Barton Leach, *Perpetuities in a Nutshell,* 51 Harv.L.Rev. 638, 658 (1938) (quoting John C. Gray, *Perpetuities* § 629 (3d ed. 1915)). Accordingly, I would first apply in this case the well-settled rule of contract construction that "has been applied in Utah courts in cases involving interests in land, and even in cases which also consider the application of the rule against perpetuities," Majority opinion, at 1262: " '[W]hen a provision in a contract requires an act to be performed without specifying the time, the law implies that it is to be done within a reasonable time under the circumstances....' " *Fredericksen v. Knight Land Corp.,* 667 P.2d 34, 38 (Utah

---

ment should be interpreted if feasible to avoid the conclusion that it violates the rule against perpetuities.

*Wong v. DiGrazia,* 60 Cal.2d 525, 35 Cal.Rptr. 241, 251, 386 P.2d 817, 827 (1963) (footnotes omitted).

**7.** Indeed, even under the majority's reading, *Fisher* supports the principle of construing the contract before applying the rule against perpetuities—although the majority would have us focus on the words of the contract only.

**8.** The majority opinion broadly overstates the scope of this dissent, which is not intended to present an argument for modification or revocation of the rule against perpetuities. At bottom, my opinion is that—in the narrow set of instances involving an option contract containing no language regarding time of exercise of the option—Utah law directly supports determining the implied reasonable time within which the parties intended the option could be exercised, before applying the rule against perpetuities. I believe all purported dispositions of interests in land containing language expressly violating the rule or containing an implied reasonable time beyond the perpetuities period are voided by Utah's rule against perpetuities. Further, I fully agree that only the supreme court or the legislature can modify or revoke the orthodox rule against perpetuities, and I do not attempt to usurp their role.

For informational purposes only, I note that many other states have engaged in rule against perpetuities reform to avoid results similar to the one the majority opinion has reached. Robert J. Lynn, *Perpetuities Reform: An Analysis of Developments in England and the United States,* 113 U.Pa.L.Rev. 508, 514 (1965). Both legislatures and the judiciary have been involved in effecting these reforms, which have involved such changes as (1) cy pres reformation, applying "the rule for the construction of an instrument in equity, by which the intention of the donor is carried out as nearly as possible when it is impossible or illegal to give it literal effect," *id.;* (2) "an actualities or 'wait and see' test," *id.* at 515; (3) "a version of the rule coupling 'wait and see' with cy pres," *id.;* (4) sloughing off "[f]eatures of the rule that are too technical for easy comprehension" and "unusually harsh" applications of the rule, *id.* at 517; (5) stressing substance over form, *id.;* (6) "exempt[ing] options and rights of first refusal from the Rule's coverage, but simultaneously plac[ing] a forty year limit on the duration of such rights in gross," Ronald B. Brown, *An Examination of Real Estate Purchase Options,* 12 Nova L.Rev. 147, 194 (1987); and (7) "limiting the duration of options, except for repurchase options and options contained in leases, to twenty years, but making those without an express duration unenforceable after two years," *id.* Professor Leach even proposes a statute that just plain excludes from the rule's application options and other commercial transactions. Leach, *supra* note 2, at 1324. In any case, "there appears to be a trend to relax the inflexible application of the rule and to give effect to the intention of the parties." Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability,* 19 Tex.Tech.L.Rev. 1263, 1376 (1988).

1983) (land option) (quoting *Bradford v. Alvey & Sons,* 621 P.2d 1240, 1242 (Utah 1980) (earnest money agreement)); *accord Catmull v. Johnson,* 541 P.2d 793, 795–96 (Utah 1975) (royalties option); *Christensen v. Christensen,* 9 Utah 2d 102, 106, 339 P.2d 101, 104 (1959) (land contract); *Commercial Sec. Bank v. Johnson,* 110 Utah 342, 349, 173 P.2d 277, 280–81 (1946) (involving plant construction as condition precedent to sale); *Cummings v. Nielson,* 42 Utah 157, 168, 129 P. 619, 622 (1912) (land option); *Cooper v. Deseret Fed. Sav. & Loan Ass'n,* 757 P.2d 483, 485 (Utah App.1988) (due on sale clause). I would next remand to the fact finder to make this factual determination. *See Fredericksen,* 667 P.2d at 38 (stating when controversy exists reasonable time is for trial court to decide). Then, under the correct analysis, after the fact finder identifies a reasonable time, the rule against perpetuities should be " 'remorselessly applied,' " Leach, *Nutshell, supra,* at 658 (quoting Gray, *supra,* § 629).[9]

### C. Other Perpetuities Cases

The majority opinion is a first in Utah. Never before has a reported Utah case invalidated any interest whatsoever based on the rule against perpetuities. Obviously, the rule is not to be applied as harshly and mechanically as the majority opinion would have us believe. Utah decisions have used a variety of rationales to find land interests valid against rule against perpetuities attacks.

The most notable of these for our purposes is, of course, *Fisher v. Bailey,* 14 Utah 2d 424, 385 P.2d 985 (1963), which at its most basic level really relies on the implication of a reasonable time shorter than the perpetuities period. *See id.* at 987–88; *see also Hallman v. Safeway Stores, Inc.,* 368 F.2d 400, 404 (5th Cir.1966) (implying reasonable time); *Byke Constr. Co. v. Miller,* 140 Ariz. 57, 680 P.2d 193, 196 (Ct.App.1984) (same); *Wong v. DiGrazia,* 60 Cal.2d 525, 35 Cal.Rptr. 241, 249, 386 P.2d 817, 825 (1963) (same); *Smerchek v. Hamilton,* 4 Kan.App.2d 346, 606 P.2d 491, 497 (1980) (same); *Peterson v. Tremain,* 35 Mass.App.Ct. 422, 621 N.E.2d 385, 387 (1993) (same); *Mattern v. Herzog,* 367 S.W.2d 312, 318 (Tex.1963) (same); Lewis M. Simes & Allan F. Smith, *The Law of Future Interests* § 1244, at 162–63 (2d ed. 1956) (noting when option states no time limit, it may be proper to interpret option to be exercised in reasonable time); William Berg, Jr., *II. Long–Term Options & the Rule Against Perpetuities,* 37 Cal.L.Rev. 235, 262 (1949) ("Options without stated time limits which do not purport to extend expressly to the heirs, assigns, or other successors in interest of the original optionee are limited in duration to a reasonable length of time...."); R.A. Shapiro, Annotation, *Validity of Option to Purchase Realty as Affected by Indefiniteness of Term Provided for Exercise,* 31 A.L.R.3d 522, 522–23 (1970) ("Although the courts have recognized generally that the time for performance is one of the essential terms of [option] contracts, they have been astute to find an implied condition that the option must be exercised in a 'reasonable' time and accordingly have rejected claims of invalidity based on this ground even

---

9. For the sake of information, some courts and commentators advocate bypassing this last part of the analysis. For example, there is authority that a reasonable time for subdivision development would necessarily be less than the perpetuities period. In *Ryland Group, Inc. v. Wills,* 229 Va. 459, 331 S.E.2d 399 (1985), the court stated: "A reasonable time for completion of development would be far less than 21 years. That the parties contemplated performance within a commercially reasonable period is demonstrated by their provision that time was of the essence of the contract." *Id.* 331 S.E.2d at 404; *see also Wong,* 35 Cal.Rptr. at 249, 386 P.2d at 825 ("Many courts ... presume that a 'reasonable time' is less than the period of the rule."); David M. Becker, *A Methodology for Solving Perpetuities Problems under the Common Law Rule: A Step-Step Process That Carefully Identifies All Testing Lives in Being,* 67 Wash.U.L.Q. 949, 1129 (1989) ("[T]hese options are always intended to expire within a reasonable time, something less than twenty-one years."); Jesse Dukeminier, *A Modern Guide to Perpetuities,* 74 Cal.L.Rev. 1867, 1909 (1986) ("No good reason appears why a court should not save an unlimited option to purchase by holding that the parties intended the option to be exercised within a reasonable time, which is necessarily less than twenty-one years."). Similarly, that Russell and Coulter contemplated performance within a commercially reasonable period less than 21 years may be shown by their use of terms such as "posthaste" to describe their intent regarding time of performance.

where the option was totally silent as to the time for exercise.").

In both *Clark v. Shelton*, 584 P.2d 875 (Utah 1978), and *Kamas State Bank v. Bourgeois*, 14 Utah 2d 188, 380 P.2d 931 (1963), the court construed the options [10] to be personal to the option holder or otherwise limited to exercise within a life in being. *See Clark*, 584 P.2d at 877; *Kamas*, 380 P.2d at 933. The options thus did not exceed the perpetuities period and were valid. *See Clark*, 584 P.2d at 877; *Kamas*, 380 P.2d at 933; *cf. Shaffer v. Reed*, 437 So.2d 98, 99 (Ala.1983) (voiding option expressing no time for exercise based on rule against perpetuities because option provided it was binding on heirs, executors and assigns); *Otter Creek Dev. Co. v. Friesenhahn*, 295 Ark. 318, 748 S.W.2d 344, 345–46 (1988) (same); *Starcher Bros. v. Duty*, 61 W.Va. 373, 56 S.E. 524, 526–27 (1907) (same); Restatement (First) of Property § 393, at 2316 (stating option without time of performance term does not violate rule against perpetuities "when the option is found, from the language *and circumstances of its creation*, to have been intended to be exercisable only by an already conceived optionee himself, and not by any successor in interest to such optionee" (emphasis added)).

Finally, in *Anderson v. Anderson*, 15 Utah 2d 7, 386 P.2d 406 (1963), the court construed a conditional deed/sales contract in escrow to be valid under the rule against perpetuities because the court determined it involved no present interest in land. *Id.* at 407–08. And, in *Hidden Meadows Dev. Co. v. Mills*, 29 Utah 2d 469, 511 P.2d 737 (1973), the court found an option contract that could be renewed perpetually to be valid because the contract provided both parties the annual opportunity to end the option. *Id.* at 739.

Although these cases have different ways of reaching the same result, they adhere to a very basic tenet—a focus on party intent. *See Clark*, 584 P.2d at 877; *Hidden Meadows*, 511 P.2d at 739; *Fisher*, 385 P.2d at

987; *Kamas State Bank*, 380 P.2d at 933.[11] The majority opinion ignores this important principle unnecessarily.

> Though intention of the parties to an instrument cannot defeat the enforcement of the rule against perpetuities, such intention must be ascertained for the purpose of determining the effect of the instrument, i.e., whether the rule is applicable to the factual situation, and such intention is determined by usual applicable rules governing construction or application of language of written instruments.

*Greco v. Meadow River Coal & Land Co.*, 145 W.Va. 153, 113 S.E.2d 79, 83 (1960). Accordingly, in the course of construing the option agreement here, I would observe the teachings of Utah law and ascertain party intent regarding the reasonable time within which the option may be exercised before determining the option agreement's validity under the rule against perpetuities.

## II. POLICY CONSIDERATIONS

"[T]he rule against perpetuities is not merely a technical rule to be mechanically applied. The rule was created by judges to serve important considerations of public policy, and should be applied with those policies in mind." *Cambridge Co. v. East Slope Inv. Corp.*, 700 P.2d 537, 540 (Colo.1985); *see also Continental Cablevision v. United Broadcasting Co.*, 873 F.2d 717, 723 (4th Cir.1989) ("When undertaking to construe and apply the Rule Against Perpetuities, a court will be well-advised to investigate and appreciate the history of the rule and its application."); William Berg, Jr., *III. Long–Term Options and the Rule Against Perpetuities*, 37 Cal.L.Rev. 419, 453 (1949) ("This plan of isolating the Rule, stressing its remoteness of vesting aspect, and divorcing it from the rule against restraints on alienation has led to confusion, particularly in the option cases, and has tended to create the impression that the Rule

---

**10.** I use this term loosely here. Actually *Clark* involved a right of first refusal, *Clark v. Shelton*, 584 P.2d 875, 876 (Utah 1978), while *Kamas* did involve a bona fide option, *Kamas State Bank v. Bourgeois*, 14 Utah 2d 188, 380 P.2d 931, 932 (1963).

**11.** *Anderson v. Anderson*, 15 Utah 2d 7, 386 P.2d 406 (1963), was decided on the basis of the legal effect of contractual language and did not discuss party intent.

Against Perpetuities is no more than a barren formula unsupported by reason.").

The rule is said to be based on policies prohibiting remoteness of vesting, restraint on alienation, and restraint on improvements. George T. Dunlap III & Fredric G. Levin, Note, *Options & the Rule Against Perpetuities*, 13 U.Fla.L.Rev. 214, 217 (1960); *accord* Restatement (Second) of Property, Div. 1, Part I, at 8–10 (1981). "The purposes behind the rule against remoteness are to curtail dead hand domination and to facilitate marketability." Dunlap & Levin, *supra*, at 217–18. The analysis I suggest allows these important policy considerations to remain intact while also honoring the parties' intent. If the fact finder decides on a reasonable time that is within the perpetuities period, then the agreement does not tie up the land long enough to violate any of the above policies. Likewise, if the fact finder decides on a reasonable time that exceeds the perpetuities period, the rule would void the option agreement in observation of its policy underpinnings.

As an aside, my research shows the application of the rule to options, and to commercial transactions in general,[12] has been roundly criticized by courts and commentators alike. A good example of the tone of this criticism follows:

> The application of the Rule Against Perpetuities to options was a step of doubtful wisdom. . . .
>
> The Common–Law period of perpetuities—lives in being plus twenty-one years—is well adapted to keeping family gift transactions within reasonable bounds. But neither lives in being nor a period of twenty-one years, nor both together, have any significance in commercial dealings. The dividing line between reasonable and unreasonable options should be based upon the realities of commerce in land, not upon a borrowing from the law of family settlements.
>
> . . . .
>
> The self-interest of the parties can be relied upon to see that long-term options are kept well within the limits of public convenience. An owner of land will not be likely to give such an option where development of the land is a real possibility; and if such an option is given, the self-interest of the option holder will lead him to exercise the option and develop the land as soon as such action offers an opportunity for profit. . . .
>
> The trouble with a prohibitory rule not supported by a real public need is that it invalidates reasonable transactions, deprives one party (the option holder) of the benefit of his bargain when it proves profitable, and gives to the other party (the option giver) a loophole by which to evade his undertaking. An examination of the cases in which options have been invalidated will reveal a series of episodes in which lawyers have enabled owners to escape obligations freely assumed; they will not reveal cases in which the performance of these obligations would have caused any detriment to the public.

6 *American Law of Property* § 24.56, at 141, 142, 144–45 (Casner ed. 1952); *see, e.g., Byke Constr. Co. v. Miller*, 140 Ariz. 57, 680 P.2d 193, 195 (Ct.App.1984) ("While we can not categorically agree that the rule has no significance in the world of commercial affairs, we believe that when current rules of . . . construction exist which would validate a transaction otherwise void by the operation of the rule . . . , they should be applied."); *Wong v. DiGrazia*, 60 Cal.2d 525, 35 Cal. Rptr. 241, 247, 386 P.2d 817, 823 (1963) ("Surely the courts do not seek to invalidate bona fide transactions by the imported application of esoteric legalisms. . . . [I]nstead we shall seek to interpret [the rule] reasonably, in the light of its objectives and the economic conditions of modern society."); *Gore v. Beren*, 254 Kan. 418, 867 P.2d 330, 338 (1994) ("[M]odern courts have recognized that the rule bears little relation to modern business practices and thus have limited application of the rule where possible, especially in commercial contexts."); Lewis M. Simes & Allan F. Smith, *The Law of Future Interests* § 1244, at 159 (2d ed. 1956); William Berg, Jr., *III. Long–Term Options & the*

---

12. "[A]n option to purchase land is nearly always a part of a commercial transaction." Lewis M.

Simes & Allan F. Smith, *The Law of Future Interests* § 1244, at 159 (2d ed. 1956).

*Rule Against Perpetuities,* 37 Cal.L.Rev. 419, 453–54 (1949); Jesse Dukeminier, *A Modern Guide to Perpetuities,* 74 Cal.L.Rev. 1867, 1909 (1986); W. Barton Leach, *Perpetuities: New Absurdity, Judicial & Statutory Correctives,* 73 Harv.L.Rev. 1318, 1322 (1960); Daniel M. Schuyler, *Should the Rule Against Perpetuities Discard Its Vest?,* 56 Mich.L.Rev. 683, 705 (1958); Margot F. Plant, Note, *Rule Against Perpetuities: Application to a Lease to Commence Upon Completion of a Building,* 47 Cal.L.Rev. 197, 200 (1959).

## III.  CONCLUSION

Based on *Fisher v. Bailey,* 14 Utah 2d 424, 385 P.2d 985 (1963), a case effectively on point with this case, Utah rules of contract construction, and policy considerations, I would remand to the trial court to determine the implied reasonable time for exercise of the option agreement at issue before I would apply the rule against perpetuities in this case.   Further, the authorities I have cited throughout this opinion show my analysis is in harmony with the majority rule in this country.[13]  Accordingly, I dissent.

---

**13.**  I state this not to say the majority rule should control where the Utah Supreme Court differs, but to bolster my analysis based on Utah law, which I believe was in accord with the majority rule in the United States until the majority opinion in this case issued.